```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X
                                         :
IN RE WORLDCOM, INC. SECURITIES          :       MASTER FILE
LITIGATION                               :       02 Civ. 3288 (DLC)
                                         :
This Document Relates to:                :
                                         :
-----------------------------------------X       OPINION AND ORDER
                                         :
IQ HOLDINGS, INC.,                       :
                                         :
                Plaintiff,               :
         -v-                             :       No. 03 Civ. 1785
                                         :
ARTHUR ANDERSEN, LLP, BERNARD EBBERS,    :
SCOTT SULLIVAN, DAVID F. MEYERS, MAX     :
BOBBITT, JAMES C. ALLEN, JUDITH AREEN,   :
FRANCESCO GALESI, BUFORD YATES, BETTY    :
VINSON, TROY NORMAND, CLIFFORD           :
ALEXANDER, CARL AYCOCK, STILES KELLETT,  :
GORDON MACKLIN, JOHN PORTER, BERT        :
ROBERTS, JACK GRUBMAN, CITIGROUP GLOBAL  :
MARKETS, INC. f/k/a SALOMON SMITH        :
BARNEY INC., CITIGROUP INC.              :
                                         :
                Defendants.              :
                                         :
-----------------------------------------X
```

Appearances:

For Plaintiff IQ Holdings, Inc.:
Kenneth Morris
Kenneth Morris, P.C.
600 Jefferson, Suite 800
Houston, TX 77002

For Director Defendants:
Pamela Rogers Chepiga
Andrew Rhys Davies
Nathan Reilly
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020

For Defendant Stiles Kellett, Jr.:
Stuart Pierson
Jennifer Chapman
Troutman Sanders LLP

401 9th Street, N.W.
Suite 100
Washington, D.C.  20004

For Defendant Bert Roberts, Jr.:
George Ridge
Cooper Ridge & Lantinberg, P.A.
200 West Forsyth Street, Ste. 1200
Jacksonville, FL 32202

For Defendant Arthur Andersen LLP:
Eliot Lauer
Michael Moscato
Jacques Semmelman
Milos Naumovic
Elizabeth Miller
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178

For Defendants Citigroup Inc., Citigroup Global Markets Inc. f/k/a Salomon Smith Barney Inc., and Jack Grubman:
Richard A. Rosen
Brad S. Karp
Eric S. Goldstein
Walter Rieman
Joyce S. Huang
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064

and

Peter K. Vigeland
Wilmer Cutler Pickering Hale and Dorr LLP
399 Park Avenue
New York, NY 10022

DENISE COTE, District Judge:

This Opinion addresses motions to dismiss filed in an Individual Action consolidated for pretrial purposes with the

WorldCom Securities Litigation.[1]  Defendants have moved as part of the Phase Three motions to dismiss filed in the Securities Litigation to dismiss the first amended complaint ("Complaint") filed in IQ Holdings, Inc. v. Arthur Andersen LLP, et al., 03 Civ. 1785, on July 11, 2003.  For the following reasons, the motions are granted in part.

Plaintiff alleges that it purchased WorldCom common stock on March 21 and June 25, 2002.  It alleges claims against WorldCom Officers and certain Directors,[2] the Citigroup Defendants, and Andersen, under the federal securities statutes and Texas law.  The first five claims are pleaded under Sections 10(b) and/or 20(a) of the Exchange Act against WorldCom Officers and certain Directors,[3] Andersen, and two Citigroup Defendants.  Claims Six

---

[1] The names and terms in this Order are as defined in Opinions issued in the WorldCom Securities Litigation.  See, e.g., In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319 (S.D.N.Y. 2005) (approving settlement with remaining defendants in class action); In re WorldCom, Inc. Sec. Litig., 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004) (approving Citigroup settlement in class action).  Familiarity is assumed with Opinions issued in the Securities Litigation which describe the procedural background to that litigation in general and to the management of the Individual Actions in particular.

[2] The Officer and Director Defendants named in the Complaint are Ebbers, Sullivan, Myers, Bobbitt, Allen, Areen, Galesi, Alexander, Aycock, Kellett, Macklin, Porter, Roberts, Sidgmore, Tucker, Yates, Vinson, and Normand.  Bobbitt, Allen, Areen and Galesi were members of the Board of Director's Audit Committee.

[3] The Section 10(b) claim is pleaded against Ebbers, Sullivan, Myers, Bobbitt, Allen, Areen, Galesi, Kellett, Sidgmore, Yates, Vinson and Normand.  The Section 20(a) claim is pleaded against most of those same defendants and adds Alexander, Aycock, Macklin, Porter, Roberts and Tucker.

3

through Eight are pleaded under Texas law against all defendants. Acknowledging that Texas law requires proof of actual knowledge to sustain a claim of negligent misrepresentation, the plaintiff has agreed to the dismissal of Claim Six.

For the reasons described below, all state law claims are dismissed, and the Section 10(b) claim is dismissed as to all but one of the Director Defendants named in that claim. The motion brought by the Citigroup Defendants to dismiss the Section 10(b) claim is denied without prejudice to its renewal as a motion for summary judgment.


Federal Law Claims

1. Exchange Act Section 10(b): Citigroup Defendants

The Citigroup Defendants move to dismiss the Section 10(b) claim pleaded against them on the ground that IQ Holdings does not adequately allege either its reliance on, or loss causation as to, any misrepresentation by these defendants. IQ Holdings responds principally that its pleading is largely derivative of that filed by the class action, which survived motions to dismiss brought by the Citigroup Defendants. The relevant passages of the Complaint to which the parties point allege the following.

IQ Holdings describes itself simply as a Texas corporation. It first acquired WorldCom common stock on March 21, 2002, when it purchased 200,000 shares. Among the events that preceded that purchase are the following. WorldCom issued a series of false financial statements and its leadership described its prospects

4

optimistically.  During this same period, Citigroup's affiliate Salomon and its telecommunications analyst Grubman issued glowing reports extolling WorldCom's virtues even though Grubman had come to realize that WorldCom's business model was in peril.  Grubman misrepresented his understanding of WorldCom's financial condition because of various conflicts of interest that infected Salomon's relationship with WorldCom.  IQ Holdings asserts that the failure to disclose the conflicts rendered Grubman's analyst reports false and misleading.  Grubman's enthusiastic recommendations to investors included a statement on January 29, 2002, in which he described WorldCom as a "best play[]".

On February 7, 2002, WorldCom's CEO announced that the company would likely write-down goodwill by between $15 and $20 billion, but he reassured investors that bankruptcy or a credit default was not a concern.  A month later, on March 7, the SEC requested production of WorldCom documents.  After news of the SEC inquiry became public on March 12, WorldCom's stock price "plunged" to $7.93 per share.  Even prior to that time, WorldCom stock had lost most of its value.  That same day, WorldCom's CEO gave false assurances to investors that WorldCom's accounting complied with SEC rules.  On March 12, Grubman reiterated his buy recommendation and dismissed the SEC inquiry as straightforward and almost boilerplate.  As noted, amidst this troubling news, IQ Holdings made its first purchase on March 21.

Approximately a month later, on April 21, with WorldCom's stock trading at $4 per share, Grubman reduced his buy

5

recommendation to a neutral rating.  IQ Holdings asserts, "[n]otably, at that point, it was obvious that due to the drastic decline of WorldCom's share price, WorldCom would not be seeking to acquire other companies in stock-for-stock transactions or gaining funds through the kind of note offerings for which Salomon served as a lead underwriter."

In anticipation of its issuance of its financial statements for the first quarter of 2002, WorldCom issued a reassuring press release on April 25.  Its CEO abruptly resigned, however, on April 30, and WorldCom's stock dropped quickly to $1.79.  IQ Holdings sold 32,500 shares a few days later, on May 6.

On May 15, WorldCom filed its first quarter financial statement.  According to a June 16 Wall Street Journal article, one accounting specialist was opining that "the WorldCom debacle 'shows a breakdown in the chain of responsibility....  From [Anderson] [sic] WorldCom's longtime auditor to top management and the audit committee, all of these guys have to be responsible.'"

On June 25, after the close of business, WorldCom issued a "devastating press release" revealing one of the largest financial and accounting frauds in the history of America and announcing a restatement of its financial statements.  IQ Holdings' second and final purchase was made on June 25, 2002, when it purchased 500,000 shares of WorldCom common stock.

On July 8, WorldCom's CEO and CFO invoked the Fifth Amendment when called to testify before Congress. All of IQ Holdings' remaining shares were sold on July 10 and 11, 2002.

IQ Holdings asserts generally that its purchases were made in reliance on WorldCom's publicly-disseminated information. It also asserts that it relies in part upon the presumption of reliance emanating from the fraud on the market doctrine, and relied in particular on the integrity of the prices set by the market for WorldCom securities in deciding to purchase WorldCom shares. It contends that the defendants' conduct had an impact on those market prices and market integrity, and that the securities traded at artificially inflated prices until the time the adverse information concealed from the public was revealed. It does not describe the price at which it purchased its WorldCom stock, or in the case of June 25, the time at which it made its purchase.

The context in which this motion to dismiss is brought is unusual. This lawsuit is one of many Individual Actions filed in the Securities Litigation. The Individual Actions were consolidated for pretrial purposes with the class action. As a result, the discovery taken by plaintiffs (including IQ Holdings) of the defendants concluded in July 2004. All that remains, therefore, is the completion of discovery of the plaintiffs who have filed Individual Actions and who have yet to settle their lawsuits.

The issues at stake in the motion brought by the Citigroup Defendants are made more difficult to address by the plaintiff's failure to plead such basic information as the price at which it purchased securities, or in the context of the shattering events of June 25, the time of day at which it made its purchase. It is also noteworthy that the plaintiff chose not to disclose that information even in its opposition to the motion despite the defendants' pointed reference to the Complaint's silence on these matters.

The defendants assert that the plaintiff is a "vulture" fund, that it in fact did not rely on the integrity of publicly disclosed information, and that any losses it sustained (which are not quantified in the Complaint) were not caused by any omission or false statement attributed to the Citigroup Defendants. Given the unusual posture of this motion practice, in particular the fact that no further discovery will be taken of the defendants, these issues are best addressed after discovery is taken of the plaintiff. The Citigroup Defendants' motion to dismiss is denied without prejudice to renewal through the filing of a summary judgment motion.

2. Exchange Act Section 10(b): Director Defendants

Certain Director Defendants named in the Section 10(b) claim move to dismiss the claim on the ground that it fails to plead

that they acted with scienter.[4] Acknowledging that, to the extent its pleadings parrot the complaint filed in the WorldCom securities class action, its allegations have already been found insufficient to plead scienter as to either Sidgmore or the four Audit Committee Defendants,[5] plaintiff points to allegations in paragraphs 274 through 283 of the Complaint as assertions not made by the Lead Plaintiff in the WorldCom class action.

At the paragraphs to which IQ Holdings points, the Complaint alleges that Bobbitt was put on notice of the fraud on June 13, 2002, received a second report on June 18, and informed the Audit Committee on June 19; and that the Audit Committee met on June 20 and 24 to address the issue and informed the public on June 25. These allegations are clearly insufficient as a matter of law to allege scienter on the part of Sidgmore and three of the four Audit Committee members. The only issue requiring any discussion is whether Bobbitt's alleged delay in informing his fellow members of the Audit Committee of the June 13 disclosure to him is sufficient to allege scienter.

June 13, 2002 was a Thursday. Bobbitt is alleged to have received a confirmatory report of the fraud on the following Tuesday and to have advised the Audit Committee on Wednesday. There is no allegation that WorldCom made any false statements

---

[4] The movants are Bobbitt, Allen, Areen, Galesi, and the Estate of Sidgmore.

[5] See In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392 (S.D.N.Y. 2003); In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288 (DLC), 2003 WL 23174761 (S.D.N.Y. Dec. 3, 2003).

9

during this interval. The issue is therefore whether Bobbitt had a legal duty to take steps to correct previously made false statements and, if so, whether a delay of three business days in advising fellow members of the Audit Committee of the information recently disclosed to him is sufficient to create a strong inference that Bobbitt had fraudulent intent to engage in securities fraud because he knew facts or had access to information suggesting that the public statements previously made by WorldCom were inaccurate. See Novak v. Kasaks, 216 F.3d 300, 311 (2d Cir. 2000). It bears noting again that the Audit Committee, including Bobbitt, announced a massive Restatement of WorldCom's financial statements just days later, on June 25, and also advised the public at that time of its ongoing investigation. Assuming a duty to correct, it is perhaps conceivable that in some circumstances a delay in making a report for a few days may allow such an inference, but on the facts as alleged here it does not. The Section 10(b) claim must be dismissed as to Bobbitt as well.

State Law Claims

Andersen moves to dismiss the two remaining Texas state law claims. The other defendants join in that motion.

1. Texas Securities Act

In Count VII, IQ Holdings brings a claim under Texas Securities Act ("TSA") art. 581-33A(2) and F(2)("Section 33A" and

10

"Section 33F"). Section 33 is addressed to civil liability with respect to the issuance or sale of a security. Section 33A reads in pertinent part:

> Liability of Sellers.
> (1) Registration and Related Violations. A person who offers or sells a security in violation of [certain provisions of this statute] is liable to the person buying the security from him....
> (2) Untruth or Omission. A person who offers or sells a security...by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him....

Tex. Civ. St., art. 581-33A. Section 33F creates liability for "aiders." It provides that a person who

> directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A...jointly and severally with the seller...to the same extent as if he were the seller....

Tex. Civ. St., art. 581-33F(2).

Texas courts consider Section 33A to be "virtually identical" to Section 12(a)(2) of the Securities Act of 1933 ("Section 12(a)(2)"), and look to federal cases interpreting Section 12(a)(2) when interpreting Section 33A. Geodyne Energy Income Prod. P'ship I-E v. Newton Corp., 97 S.W.3d 779, 783 (Tex. App. 2003). See also In re Enron Corp. Sec., Derivative & ERISA Litig., 2004 WL 764664, H-01-3624, at *6 (S.D.Tex. Mar. 31, 2004)("Enron II"). To be liable as a seller under Section

12(a)(2),[6] the defendant must be the "buyer's immediate seller; remote purchasers are precluded from bringing actions against remote sellers. Thus, a buyer cannot recover against his seller's seller." Pinter v. Dahl, 486 U.S. 622, 644 n.21 (1988). Similarly, Section 33A imposes a strict privity requirement. "[F]or primary liability under the Texas statute the purchaser/plaintiff may sue only his immediate 'seller' (i.e., the person and/or his agent who successfully passes title [or] who actively solicited the purchase)." Enron II, at *7.

Section 33F imposes liability on a party that aids and abets the violation of Section 33A. See Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App. 2000). WorldCom, as the issuer, is not liable under Section 33A unless it sold the securities directly to the plaintiff or was sufficiently involved in the solicitation of the sale to the plaintiff to be deemed the seller's agent. Therefore, allegations that a defendant generally aided WorldCom in its commission of fraud do not state a claim under Section 33F.

IQ Holdings has not identified the seller in its Complaint, but asserts in opposition to this motion that it bought its

---

[6] Section 12(a)(2) of the Securities Act, known as Section 12(2) prior to the amendments enacted as part of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u4-b, allows a purchaser of a security to bring a private action against a seller that "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading." 15 U.S.C. § 771(a)(2).

12

WorldCom securities from an unidentified seller through a transaction on the Nasdaq, where WorldCom stock was publicly traded.  IQ Holdings argues that Andersen materially aided all sellers in the market.  This _ipsi dixit_ assertion in an opposition brief does not overcome the legal impediments to the aiding and abetting claim.  Without the identification and adequate pleading of the underlying substantive violation of Section 33A by the party who sold WorldCom stock to IQ Holdings, there is no liability for aiding and abetting that violation.  Because IQ Holdings has not pleaded a violation of Section 33A, neither Andersen nor any other defendant named in Count VII can be held liable for aiding and abetting that violation.

2.  Texas Business and Commerce Code

Count VIII alleges that defendant violated Texas Business and Commerce Code § 27.01 ("Section 27").  IQ Holdings alleges a violation of each of the four prongs of Section 27.  Section 27, which applies to fraud in real estate and stock transactions, reads in pertinent part:

>     (a) Fraud in a transaction involving ... stock in
> a corporation ... consists of a
>         (1) false representation of a past or existing
> material fact, when the false representation is
>             (A) made to a person for the purpose of
> inducing that person to enter into a contract; and
>             (B) relied on by that person in entering into
> that contract; or
>         (2) false promise to do an act, when the false
> promise is
>             (A) material;
>             (B) made with the intention of not fulfilling
> it;

>             (C) made to a person for the purpose of
> inducing that person to enter into a contract; and
>             (D) relied on by that person in entering into
> that contract.
>       (b) A person who makes a false representation of
> false promise commits the fraud described in Subsection
> (a)....
>
>       (c)  A person who makes a false representation or
> false promise with actual awareness of the falsity
> thereof commits the fraud described in Subsection
> (a)....
>
>       (d) A person who (1) has actual awareness of the
> falsity of a representation or promise made by another
> person and (2) fails to disclose the falsity of the
> representation or promise to the person defrauded, and
> (3) benefits from the false representation or promise
> commits the fraud described in Subsection (a) of this
> section and is liable to the person defrauded....

Tex. Bus. & Com. Code Ann. § 27.01

This statutory fraud section is similar to a common law claim for fraud under Texas law, except that it does not require proof of knowledge or recklessness for an award of actual damages. See, e.g., Fletcher v. Edwards, 26 S.W.3d 66, 77 (Tex. App. 2000). Under the Texas common law of fraud, liability exists even in the absence of privity where the plaintiff can show that a misrepresentation was intended to reach a third person and induce reliance. Ernst & Young, L.L.P. v. Pacific Mutual Life Insurance Co., 51 S.W.3d 573, 578 (Tx. 2001). While finding it unnecessary to decide whether it should adopt Section 531 of the Restatement (Second) of Torts (1977), the Supreme Court of Texas has held that the Texas common law of fraud is consistent with that provision to the extent that it requires a plaintiff's reliance on a defendant's statement to have been

"'especially likely'". Id. at 580. Mere foreseeability is insufficient. Id. Thus, even an "obvious risk that a third person will rely on a representation is not enough to impose liability." Id. at 581. Instead, the

> maker of the misrepresentation <u>must have information</u> that would lead a reasonable man to conclude that there is <u>an especial likelihood</u> that it will reach those persons and will influence their conduct. There must be something in the situation <u>known to the maker</u> that would lead a reasonable man to govern his conduct on the assumption that this will occur.

Id.

In <u>Ernst & Young</u>, the Supreme Court entered judgment for an accounting firm on the ground that the plaintiff investor had not shown that the defendant had reason to expect that it would rely on the defendant's certified audit report when it purchased notes issued by the audited company. Id. at 583. The notes had been issued in 1982, but were sold in 1987 to the plaintiff, who relied on the defendant's certified audit of the issuer's 1986 financial statements in making its decision. The certification and audited statements had been filed with the SEC. Id. at 580-81. Evidence that Ernst & Young knew that its audit reports would be widely disseminated throughout the investment community, and that investors would rely upon information in its audit reports, was insufficient to create an issue of fact requiring a trial. Id.

The defendants have shown that they are entitled to dismissal of the Section 27 claim. IQ Holdings does not stand in any different shoes than the investor in <u>Ernst & Young</u> whose

15

claim was dismissed by the Supreme Court of Texas.  It has alleged no special communication with any of the defendants, or any particular facts giving rise to an inference that a defendant had information from which to conclude that there was "an especial likelihood", id. at 581, that IQ Holdings would rely on their public statements.

Even with respect to subsection (d) of Section 27, IQ Holdings' Complaint falls short.  That subsection extends liability to a party who has actual awareness of a fraud, fails to disclose it, and "benefits from the false representation or promise." § 27.01 (d).  This applies to those who have benefitted in the specific sale of real estate or stock in which the fraud occurred, for instance a company who receives fees in a real estate closing, see, e.g., Belton v. Dover Prop. Sales, Inc., No. 3-85-0557-H, 1985 WL 8797, at *3 (N.D. Tex. July 16, 1985).  IQ Holdings does not allege, or suggest in its opposition papers that it could allege, that any defendant benefitted from either of the two transactions in which it purchased WorldCom stock.

## Conclusion

The Citigroup Defendants' motion to dismiss the Section 10(b) claim is denied without prejudice to renewal as a motion for summary judgment following discovery of the plaintiff.  The motion by Director Defendants Bobbitt, Allen, Areen, Galesi, and the Estate of John Sidgmore to dismiss the Section 10(b) claim is granted.  The defendants' motions to dismiss the three state law

claims are granted; those claims are dismissed in their entirety and with prejudice. Discovery shall proceed as scheduled in the Order of March 6, 2006.

SO ORDERED:
Dated:   New York, New York
         April 21, 2006

                                    _____
                                              DENISE COTE
                                    United States District Judge